**James T. WATT, Administrator, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. B-224.**

United States District Court E. D. Arkansas, N. D.

Sept. 13, 1954.

Kaneaster Hodges, Newport, Ark., Paul B. Young, Pine Bluff, Ark., for plaintiff.

Gerland P. Patten, Little Rock, Ark., for defendant.

LEMLEY, District Judge.

This cause having been tried to the Court, and the Court being well and sufficiently advised doth make and file herein the following Findings of Fact, Conclusions of Law and Comment thereon, to-wit:

### Findings of Fact

1. This is a suit against the United States which had been brought by the plaintiff, James T. Watt, as administrator of the estates of his father, G. C. Watt, and of his mother, Nennie McDougal Watt, both deceased, under the provisions of the Federal Tort Claims Act of 1946 as carried forward into Title 28 of the United States Code. 28 U.S.C.A. §§ 1346(b) and 2674.[1] Plaintiff seeks to recover damages for the deaths of his parents which occurred as a result of a collision between the DeSoto automobile in which they were riding and a truck assigned to Company "I", 153d Infantry, Arkansas National Guard, which collision took place on Arkansas State Highway No. 14 at a point on the bridge over Cache River between Jonesboro and Newport, Arkansas. The truck was being driven at the time of the accident by Sergeant First Class Jerry G. Reedy who was the unit administrative assistant of Company "I" above mentioned; the Watt automobile was being driven by Mr. G. C. Watt but was the property of Mrs. Watt. As a result of the collision Mrs. Watt was almost instantaneously killed, and Mr. Watt received injuries from which he died a few days later. It is the theory of the plaintiff that the accident was proximately caused by the negligence of Sgt. Reedy, that at the time of the accident he was a federal employee acting within the scope of his employment, and that the Government is liable for the damages claimed to have been sustained by the estates and next of kin of the two decedents. The defendant denies that Sgt. Reedy was a federal employee, denies that he was acting within the scope of his employment if he was in fact such an employee, and denies that he was negligent. Affirmatively, it contends that Mr. Watt was guilty of contributory

---

[1]. 28 U.S.C.A. § 1346(b), insofar as here pertinent, is as follows: "Subject to the provisions of chapter 171 of this title, the district courts, * * * shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, * * * for * * * personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." Section 2674 of the same title provides in part that: "The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages.".

negligence, and, further, that such alleged contributory negligence on his part was imputed to his wife so as to bar her estate and next of kin, as well as his, from any recovery herein.

2. At the time of the accident Sgt. Reedy was driving the truck from the armory at Jonesboro to the headquarters of the United States Property & Disbursing Officer (USP & DO) at Little Rock for the purpose of turning over to the latter certain clothing formerly issued to Company "I" and for the further purpose of drawing additional supplies and equipment for the use of said unit. He was accompanied on the trip by Sergeant First Class Reuben F. Taylor who was the unit caretaker for said National Guard unit. When the accident occurred, Mr. and Mrs. Watt were returning to their home in Tennessee after having visited Mrs. Watt's brother, who resides in Newport.

3. The bridge where the accident occurred runs east and west across Cache River; it was 900 feet long and 21 feet wide, and while it was not a one-way bridge, it was extremely narrow, and in order for two vehicles to meet on it and pass in safety proper care had to be exercised by both drivers. The flooring and railings of the bridge were of wood, and the planking of the floor ran lengthwise parallel to the railings. On the day of the accident it was raining, and the bridge surface was quite slick, a condition which materially increased the likelihood of accident. The dangerous nature of the bridge had been recognized by the Arkansas State Highway Department, as is evidenced by the fact that "Slow" and "Narrow Bridge" signs had been erected on the approaches at both ends, and the ends of the railings had been painted with diagonal lines indicating danger. Both Sgt. Reedy and Sgt. Taylor had made the round trip between Jonesboro and Little Rock many times; both were thoroughly familiar with the bridge, and both knew that it presented a hazard, particularly when wet and slick.

A motorist proceeding toward Little Rock from the east approaches this bridge around a gentle curve, and when he is yet a substantial distance east of the bridge, he obtains an unobstructed view for its entire length; conversely, a motorist approaching from the west has a similar unobstructed view for the entire length of the bridge. As indicated, the warning signs at each end of the bridge were identical.

4. Prior to reaching the bridge Reedy and Taylor had been driving about 35 or 40 miles per hours, and as the truck rounded the curve leading to the bridge it was going about 35 miles per hour; said truck was a rather large and a very heavy vehicle. According to the testimony of both Reedy and Taylor, which we credit, they first saw the Watt automobile approaching when they were 150 or 200 feet east of the bridge; said vehicle was traveling about 40 or 45 miles per hour and was being driven down the middle of the structure; although it was on the bridge, it had not reached the center thereof when first observed by Reedy and Taylor.

When Reedy saw the Watt car approaching, he made no effort to stop his truck so as to allow Mr. Watt to clear the bridge; nor did he reduce its speed to an extent sufficient to bring it under immediate control. He did reduce speed somewhat and entered the bridge at a speed of from 10 to 20 miles per hour, expecting Mr. Watt to pull over to the right so that the vehicles would clear. He admitted, however, that when he entered the bridge, Mr. Watt had not slowed down and had made no move to get over on his own side of the roadway. Almost immediately upon entering the bridge Reedy sensed danger, and applied his brakes, which action threw the truck into a skid to the left; said vehicle crossed the center line of the bridge and struck the south railing, skidding along it for some distance; thereafter, the vehicle moved back toward the middle of the bridge, and the impact occurred near the center thereof. After the collision

the Watt car was on its own side of the road, but whether Mr. Watt had pulled over to that side prior to the impact or whether the car was carried there by the force of the collision is not altogether clear since Reedy and Taylor, the only surviving eye-witnesses, testified that when they began to skid, they devoted all of their attention to the truck and did not see what Mr. Watt did.

5. As stated, Sgt. Reedy was the unit administrative assistant of the National Guard unit which has been mentioned; as such he was an employee of the United States. We find, however, that at the time of the accident he was not acting within the scope of his employment as such federal employee since his duties as unit administrative assistant did not include the operation of motor vehicles in connection with transporting property to and from Jonesboro; his duties, according to the evidence, were prescribed by regulations, were primarily clerical in nature, and were limited to tasks to be performed in and around the armory at Jonesboro. The duty of driving the truck between Jonesboro and Little Rock was one of the duties of Sgt. Taylor as unit caretaker, and, as has been said, the latter, while present, was not driving.

6. While the preceding finding is of itself fatal to the claims of the plaintiff, we further find, for purposes of the record, that Sgt. Reedy was guilty of negligence which was a proximate cause of the accident and of the deaths of the plaintiff's decedents. As we view the situation, Reedy was confronted with a potentially dangerous situation while he was yet a considerable distance from the bridge; looking down this bridge, which he knew was narrow and dangerous, particularly under the conditions then existing, he saw a driver approaching at what was under the circumstances a dangerous rate of speed and driving in the middle of the road. Under such circumstances, we think that ordinary care required Sgt. Reedy to either stop the truck before entering the bridge so as to allow Mr. Watt to clear it, or to so reduce the speed of the vehicle as to bring it under imme-

diate control and at the same time afford Mr. Watt the maximum opportunity to get back on his own side of the center line. Sgt. Reedy pursued neither course, however; while he slackened his speed somewhat, he was still going at such a pace that when he undertook to apply his brakes, the truck went into a skid from which he was unable to extricate it in time to avoid the collision. This negligence on his part continued as an active and efficient force until the accident occurred, and it directly and proximately contributed to said accident.

7. On the other hand, we further find that Mr. Watt was also guilty of negligence which was a proximate cause of the accident, his negligence consisting of his entering the bridge at a speed which was excessive under the circumstances then and there existing, in driving his car down the middle of the bridge at practically the same rate of speed, and in failing to have the vehicle under such reasonable control as would enable him to check its speed or to stop it absolutely if necessary to avoid the impending danger.

Much that has been said concerning the negligence of Sgt. Reedy can also be said with respect to the contributory negligence of Mr. Watt. The dangerous condition of the bridge was apparent to anyone of reasonable prudence, and on approaching the bridge from the west Mr. Watt was, as heretofore pointed out, confronted with warning signs identical to those visible to Sgt. Reedy; and, of course, Mr. Watt could have seen Sgt. Reedy's truck approaching from the time it rounded the curve, just as Reedy saw the Watt car approaching. Notwithstanding the wet condition of the road and bridge, and notwithstanding the warning signs, the evidence shows that Mr. Watt entered the bridge and started across it at a speed of around 45 miles per hour, which was excessive under the circumstances even if no other vehicle had been approaching, and also that he did not stay on the right of the center line but drove down the middle of the bridge at about the same rate of speed,

continuing his course even after the truck entered the bridge. In this connection it should be pointed out that if Mr. Watt in fact saw the truck, he should have slackened his speed immediately, gotten over on his own side of the bridge, and brought the car under proper control; if he did not see the truck, it was only because he was not keeping a proper lookout, and if such was the case, then he would have been guilty of negligence in that regard.

In finding that Mr. Watt was negligent we do not overlook the fact that both he and his wife are dead, and that the only eye-witness testimony relative to his conduct comes from the lips of the other parties to the accident. But at the trial of the case both Sgt. Reedy and Sgt. Taylor made a favorable impression upon us and appeared to be trying to tell the truth. Reedy is no longer a member of the National Guard, and Taylor was not driving the truck, and no blame was ever attached to him by anyone. Hence, neither of these men can be considered as a directly interested witness, and we would not be justified in rejecting their testimony. Furthermore, their testimony as to Mr. Watt's speed finds corroboration in the initial report made by the member of the Arkansas State Police who investigated the wreck; his first impression, based upon his examination of the bridge, the condition of the vehicles, and other pertinent data, was that the Watt car had been going about 45 miles per hour, and this impression he incorporated into his written report. True, he later changed his mind on this point, but he impressed us as being now biased in favor of the plaintiff, and for some reason prejudiced against Sgt. Reedy; therefore, we do not attach to his later testimony the weight which it otherwise might have.

8. At the time of the accident Mr. Watt was operating his wife's car as her agent and was subject to her direction and control with respect to the management and operation of the vehicle.

### Conclusions of Law

1. This Court has jurisdiction of this cause and of the parties hereto.

2. Since Sgt. Reedy was not acting within the scope of his employment as unit administrative assistant of Company "I", 153d Infantry, Arkansas National Guard, at the time of the accident, the plaintiff cannot recover herein.

3. Aside from the preceding conclusion, our finding that Mr. Watt was guilty of contributory negligence precludes any recovery for the benefit of his estate or for the benefit of his next of kin.

4. Since Mr. Watt was operating his wife's car as her agent and was subject to her direction and control with respect to the management of her automobile, his contributory negligence was imputed to her and precludes any recovery herein for the benefit of her estate or for the benefit of her next of kin. This conclusion is likewise aside from Conclusion No. 2, supra.

5. The plaintiff's complaint must be dismissed with prejudice and in its entirety at the cost of the plaintiff.

### Comment

Our factual findings with respect to the negligence of Sgt. Reedy and the contributory negligence of Mr. Watt, do not, in our opinion, require any elaboration or discussion; but we deem it well to comment to some extent upon the status of Sgt. Reedy and upon the question of whether or not Mr. Watt's contributory negligence should be imputed to his wife.

In order to recover herein the plaintiff must prove, in addition to negligence, that Sgt. Reedy was an employee of the United States and, further, that at the time of the accident he was acting within the scope of his employment as such federal employee. 28 U.S.C.A. § 1346(b). That Reedy was a federal employee seems clear from the holdings of U. S. v. Holly, 10 Cir., 192 F.2d 221; Elmo v. U. S., 5 Cir., 197 F.2d 230; U. S. v. Duncan, 5 Cir., 197 F.2d 233; and Elmo v. U. S., 5 Cir., 210 F.2d 406. While

all of the cases just cited relate to the status of unit caretakers employed at various National Guard units, rather than to unit administrative assistants, we can perceive no logical distinction, as far as employment status generally is concerned, between a unit caretaker and a unit administrative assistant. In this connection it should be noted that 32 U.S.C.A. § 42 provides that funds allotted by the Secretary of the Army for the support of the National Guard may be utilized for the purpose, among others, of compensating "competent help for the care of material, animals, armament, and equipment of organizations of all kinds". It appears from the evidence in this case that prior to 1950 each National Guard unit in Arkansas had one civilian caretaker employee who was known as the "unit caretaker". In 1950, however, two positions were created, one being known as "unit administrative assistant", which position Sgt. Reedy was holding at the time of the accident, and the other retaining the old title of "unit caretaker", which Sgt. Taylor was holding at said time.[2] It further appears from the evidence that the Secretary of the Army delegated to the several adjutants general the authority to employ caretaker personnel; to fix their rates of pay, within certain limits; to prescribe their duties; to fix their hours of work, not to exceed 40 per week; and to discharge such employees. This authority, however, was to be exercised "subject to the provisions of law and such instructions as may from time to time be issued by the Chief, National Guard Bureau". From the foregoing it will be seen that both the unit administrative assistant and the unit caretaker were hired in the same manner and under the authority of the same statute, both were paid with federal funds, both were subject to discharge in the same manner, and both fell within the classification of "competent help for the care of material, animals, armament, and equipment" referred to in the statute.[3]

It is one thing to say, however, that a unit administrative assistant such as Sgt. Reedy was in the general employ of the United States and quite another thing to say that at a particular time and in the performance of a given act he was acting within the scope of his employment. It is obvious from the plain wording of the statute that both federal employment and action within the scope of such employment are both conditions precedent to governmental liability, and regardless of whether the Act should be strictly or liberally construed in other aspects, it seems clear to us that before liability on the part of the Government attaches both of these conditions must be strictly met. See in this connection the reprint of the address of Judge Leon Yankwich of California before the Judicial Conference of the Ninth Circuit delivered on June 28, 1949, and which now appears in 9 F.R.D. 143 et seq.

While we have found no case which is directly in point,[4] we are satis-

---

2. Some time after the accident here involved, the two jobs were again combined, and the tasks of both employees are at present performed by one man having the title of "Administrative Supply and Maintenance Technician".

3. A complicating factor in this case is that both were also members of the Arkansas National Guard. In this connection, 32 U.S.C.A. § 42 provides that either civilians or enlisted members of the Guard may be employed as caretakers, but that "if there are as many as two caretakers in any unit, one of them shall be an enlisted man." It is well settled that members of the National Guard, as such, are not federal employees, and that the Government is not liable for their torts un-

der the Tort Claims Act. Williams v. U. S., 10 Cir., 189 F.2d 607; Dover v. U. S., 5 Cir., 192 F.2d 431; McCranie v. U. S., 5 Cir., 199 F.2d 581. An exception to this rule exists in the case of members of the National Guard of the District of Columbia which is essentially a federal, as contrasted to a state, force. O'Toole v. U. S., 3 Cir., 206 F.2d 912.

4. While the Duncan, Holly and Elmo cases above cited held that unit caretakers were engaged in the scope of their employment while making trips such as the one involved here, it does not follow that those decisions are applicable to unit administrative assistants as far as scope of employment is concerned.

fied that Sgt. Reedy was not acting within the scope of his employment at the time of this accident. In taking up this problem, it must be kept in mind that the Government's tort liability is strictly limited by the terms of the Tort Claims Act and cannot be extended beyond those terms; further, the Government acts only through agents whose powers are defined by statute or regulation and can be bound by the acts of its agents only in cases where the latter are acting within the scope of the authority actually conferred upon them; such authority cannot be extended by custom, usage or estoppel; nor is the mere fact that the Government may derive some benefit from the act performed sufficient to impose liability upon it with respect to a tort committed in the performance of such act. The principles just stated were well expressed by Judge Goodman in his opinion in Cannon v. U. S., D.C.Cal., 84 F.Supp. 820, wherein it was said:

"In waiving its sovereign immunity and consenting to be sued, the United States fixed and bounded the area of its liability. And its liability as so fixed, cannot, under any equitable or quasi-equitable theory, be extended beyond the stated limits. By this statute, the United States consents to be sued (1) in cases of negligence of employees 'while acting within the scope of his office or employment' and then only (2) if be-

sides, the circumstances are such that a private person would be liable under the law of the place where the act or omission of the employee occurred. * * *

"There is no question but that the Government of the United States acts only through its agents with power delegated and defined by statute or regulation, which all who deal with such persons are presumed to know. The United States can be bound only by agents acting within the scope of the authority delegated to them. * * *

"Some point is also made that the services extended to plaintiff were in a sense for the benefit of the government * * *. However there is no known doctrine by which responsibility or liability is imposed upon the United States because of any benefit to it, nor does responsibility ensue as a result of estoppel, or like equitable theory.

"Since the officers and employees of the United States here clearly and admittedly acted beyond the scope of their authority, there can be no liability under the Federal Tort Claims Act. * * *" 84 F. Supp. at pages 821–823 [5].

The duties of Sgt. Reedy as unit administrative assistant were prescribed by National Guard Bureau Circular No. 4,[6] issued January 23, 1950; they were

---

[5]. The plaintiff in the Canon case sued the Government for damages which she received as a result of the alleged negligence of certain Government physicians in an Army hospital where she had undergone surgery; it developed that she, a civilian employee at the hospital, was admitted for treatment therein upon the determination of the commanding officer of the institution that she was eligible for such treatment. This determination was found to have been erroneous, and the District Court concluded that in admitting an ineligible person to the hospital the commanding officer acted beyond the scope of his employment and that there was no liability on the part of the Government for the injuries which she received while a patient. That decision was reversed, Canon v. U. S., 9 Cir., 188

F.2d 444, on the ground that the commanding officer was specifically charged with the duty of determining who was and who was not eligible for treatment, and that in making such determination he was acting within the scope of his employment; that his conclusion was erroneous in that particular instance was deemed immaterial. While, as indicated, the decision of the district court was reversed, there was no criticism of Judge Goodman's general language, which we have quoted, and with which we agree.

[6]. Sgt. Reedy's duties with respect to Government property were set forth in paragraph 3(b)2 of said circular, which was as follows: "Prepare property issue slips, requisitions, bills of lading, property lost, damaged or destroyed, shipping lists, trip

almost entirely clerical and were to be performed in and around the armory at Jonesboro.

Said duties did not include the transportation of property to and from Little Rock. The delineation of his duties which has been set forth in the preceding footnote is quite a detailed one and had it been intended for him to transport property it would seem that such duty would have been specifically listed; under the circumstances we feel that its omission is significant, especially in view of the fact that paragraph 4b of the National Guard Bureau Circular above mentioned which prescribed the duties of the unit caretaker required the latter to be responsible "for the receipt, care, maintenance and repair of unit equipment" and to "perform such clerical and stock-handling duties as may be necessary to receive T/O&E equipment for the unit during the absence of supply personnel". Moreover, while Reedy's duties in connection with the preparation of issue and turn-in slips might suggest the propriety of his going to Little Rock to discharge such duty, the evidence shows that in point of fact such slips were customarily prepared at Jonesboro, and that in the instances when they were prepared at Little Rock such was done by the staff of the USP & DO. It does not appear that the performance of any duties entrusted to Sgt. Reedy necessitated his going to Little Rock on the occasion in question; on the other hand, it seems that the purpose of his going was, at least primarily, simply to lighten Sgt. Taylor's task by relieving him from time to time at the wheel of the truck.

■ We do not overlook the fact that Lt. Col. McDaniel, Assistant Adjutant General of the State of Arkansas, testified that the duties of an administrative assistant and caretaker customarily overlapped in practice; this, however, was by reason of usage and custom upon which, as we have pointed out, liability on the part of the Government can not be predicated. We are convinced that before a federal employee can be considered as acting within the scope of his employment, as that phrase is used in the statute, he must be performing the task which he was employed to do and not some other task the performance of which was the proper concern of some other employee.

■ Taking up now the question of whether or not the contributory negligence of Mr. Watt should be imputed to Mrs. Watt, the law is well settled that the negligence of the driver of a motor vehicle will be imputed to the owner thereof who is riding in the car at the time of an accident where the relationship of principal and agent or master and servant exists between such owner and driver, or where the owner has the right to control and direct the driver with respect to the operation of the vehicle. In 60 C.J.S., Motor Vehicles, § 428, page 1054, the rule is stated as follows:

"Where the owner is present, but not driving, and the car is not subject to his control, he is not liable; where he has intrusted the operation of the car to an apparently competent driver, he is not liable for his failure to direct the driver or to exercise the same degree of diligence required of a driver. On the other hand, where he is present and controlling its operation by another, or where he is present and has the

---

tickets, dispatch records, accident reports, claims, register of serially numbered items on hand, receiving reports, consolidated memorandum receipts, inventory adjustment reports, individual clothing equipment record, consolidated reports on daily issue and use of lubricants and fuels, quarterly droppage allowances; maintain unit property records; check incoming and outgoing supplies against items listed on requisitions; invoices, and bills of lading, counting, grading or weighing articles involved; store materials in storage bins, racks, and compartments, arranging items in such manner as will facilitate taking of inventories and provide protection against dampness and deterioration; conduct such periodic inventories as may be required."

right and authority to control its operation if he desires to do so, and tacitly consents to the manner in which it is operated, the negligence of the driver may be imputed to him, on the ground that in such circumstances the relation of principal and agent or master and servant exists between them. The same rule applies where the owner is present and the automobile is being operated in and about the execution of the business or pleasure of the owner, in which case the doctrine of respondeat superior applies, and where the owner is present and engaged in a joint enterprise with the driver, * * *."

While the relationship of principal and agent or of master and servant, and the existence of a right to control the driver in the operation of the vehicle are not established as a matter of law by the mere presence of the owner in the vehicle at the time of the accident, such presence creates an inference that he has the right to control and direct the driver or that the latter is his agent or servant. See 60 C.J.S., Motor Vehicles, § 428, pages 1053–1054; 5 Am.Jur. "Automobiles", pages 783–784; and annotation entitled, "Owner's presence in automobile operated by another as affecting former's right or liability", 147 A.L.R. 960 et seq.

The Supreme Court of Arkansas has considered the effect of the owner's presence in the vehicle at the time of the accident in Wisconsin & Arkansas Lumber Co. v. Brady, 157 Ark. 449, 248 S.W. 278, and in Johnson v. Newman, 168 Ark. 836, 271 S.W. 705, in both of which cases it was held that the presence of the owner in a car driven by his wife raised a jury issue as to whether or not the negligence of the latter should be imputed to the former. More recently in Debin v. Texas Co., 190 Ark. 849, 81 S.W.2d 935, where a bailee of a motor vehicle permitted a fifteen year old boy to drive, an instruction was approved which told the jury that if the boy was guilty of negligence, the same would be imputed to the bailee, the latter being present in the vehicle and there apparently being no question of his right to control and direct the driver; and in Schuback v. Traicoff, 214 Ark. 375, 216 S.W.2d 395, the Court approved an instruction to the effect that if the wife of the owner of a truck, in which the wife was riding at the time of the accident, had procured the truck to perform a service for her husband, and had secured the services of her sister in driving the truck in order to perform such mission, the negligence of the sister would be imputed to the wife.

Wisconsin & Arkansas Lumber Co. v. Brady, supra, involved a crossing collision between appellant's train and an automobile owned and occupied by appellee, Hosea Brady, and which was being driven by his wife at the time of the accident, he occupying the front seat with her; the trial court told the jury, among other things, that if it found that the employees of appellant were negligent, and that if it found that Hosea Brady was not negligent, he would be entitled to recover. This instruction was held erroneous as leaving out of account the negligence, if any, of Brady's wife as a defense to his claim. The Court said:

"This instruction was erroneous because it ignored the negligence of the wife as a defense to the action of Hosea Brady for the injury to the automobile. Hosea Brady owned the automobile, and was in no sense a guest of his wife, so he had control, along with his wife, over the movements of the car. The negligence of Mrs. Brady, if any, therefore, was imputable to Hosea Brady, and should have been taken into account, just as his own negligence, if any, in determining whether there was liability on the part of appellants for damage to the car." 157 Ark. 455, 248 S.W. 278, 280.

In Johnson v. Newman, supra, the trial court instructed a verdict in favor of the defendant husband who at the time of the accident was present in his car which was being driven by his wife. The Supreme Court reversed the judg-

ment on the ground that there was sub-stantial evidence to take to the jury the issue of the husband's own negligence in failing to control his wife in the operation of the vehicle and likewise the issue of imputed negligence upon the theory that the wife was the husband's agent. In the latter connection it was said:

"In the next place, we are of the opinion that there was sufficient evidence to justify a submission of the issue of appellee's responsibility on the theory that his wife, while driving the car, was acting as his agent. This court has refused to accept the so-called 'family purpose' doctrine as a basis of liability on account of automobile collisions. Norton v. Hall, 149 Ark. 428, 232 S.W. 934, 19 A.L.R. 384; Volentine v. Wyatt, 164 Ark. 172, 261 S.W. 308. We have also discarded the doctrine of imputed negligence (Carter v. Brown, supra, [136 Ark. 23, 206 S.W. 71]; Miller v. Fort Smith Light and Traction Co., 136 Ark. 272, 206 S.W. 329; Pine Bluff Co. v. Whitlaw, supra [147 Ark. 152, 227 S.W. 13]; Itzkowitz v. P. H. Ruebel & Co., 158 Ark. 454, 250 S.W. 535) and the common-law liability of the husband for torts of the wife has been eliminated by statute (Bourland v. Baker, 141 Ark. 280, 216 S.W. 707, 20 A.L.R. 525) but we have not departed from the elemental principles of law of agency in determining the question of liability for automobile accidents. The doctrine of respondeat superior still obtains. In Norton v. Hall, supra, we said: 'In other words, we reject the so-called "family purpose" doctrine as stated by some of the courts in its broadest sense, though we do not mean to hold that there may not be circumstances under which it would be a question of fact for the jury to determine whether the person so operating the car was the agent of the head of the family or was agent of the particular member or members of the family for whose pleas-ure and benefit the car was then used.' In Wisconsin & Arkansas Lumber Co. v. Brady, supra, we held that the husband, who was riding in his own car which his wife was driving, was responsible for the negligence of his wife on the theory that she was, under those circumstances, acting as his agent in the operation of the car. Why should not the doctrine of respondeat superior apply under such circumstances? If the owner of a car in which he is riding permits some other person to operate it—no matter whether it is his wife or child or friend—there is no reason why the relation of principal and agent should not be held to be subsisting between them so as to make the owner, as the principal, responsible for the negligent act of the driver as his agent. The question merely involves the application of elemental principles of law on this subject, and we are of the opinion that the testimony in the case is sufficient to call for a submission of the issue as to liability of appellee on account of the negligence of his wife, as his agent as well as his own negligence, in controlling or failing to control the operation of the car. Of course, we express no opinion on the weight of the evidence further than to say that it is legally sufficient to justify a submission of the issues in regard to negligence." 168 Ark. at pages 840–841, 271 S.W. at page 707.

In view of the foregoing principles, and particularly in the light of the holdings in Arkansas & Wisconsin Lumber Co. v. Brady and Newman v. Johnson, we are satisfied that under the evidence in the instant case the negligence of Mr. Watt should be imputed to Mrs. Watt. The testimony before us is to the effect that the automobile belonged to Mrs. Watt, that she knew how to drive a car and made a practice of driving this one for short distances in the neighborhood of the family home in Tennessee, although when long trips

were made, her husband did the driving; and as we have heretofore found, the purpose of the trip from Tennessee to Newport was to visit Mrs. Watt's brother; thus, it seems to us that the mission from which Mr. and Mrs. Watt were returning when the accident occurred was actually the mission of Mrs. Watt rather than that of her husband. Under such circumstances we are convinced that Mr. Watt in driving the car was acting as the agent of his wife, and that she had the right to control and direct him in the operation of her car; that she may not in fact have done so is immaterial. Not only does the testimony which we have heard justify the inference that Mr. Watt was his wife's agent and subject to her control, but there is no evidence from which a contrary conclusion can be drawn; in the light of this evidence to hold that Mrs. Watt had no right to control the operation of her own car while it was being driven on a mission of hers would, to our mind, be nothing short of arbitrary, and such a holding could not, in our opinion, be justified in the light of the Arkansas decisions which have been discussed. The only basis, as we see it, upon which it could be said that Mrs. Watt did not have the right to control the operation of her automobile is the old proposition that the husband is the head of the household, and that his wife has no right to control him. That proposition has long been subjected to criticism, and whatever basis in fact it may have had when it was originally formulated in the days when a married woman held no separate property and was herself considered in a sense as a chattel of the husband, it is now, in mosts cases at least, no more than a fiction and has little, if any, place in the modern world of emancipated womanhood. Moreover, it is significant to note that the Court in the Brady and Johnson cases did not predicate its holdings upon the fact that the owner of the car was the husband or the "head of the house" but solely upon the fact of ownership and the presence of the owner in the car. We do not believe that any logical distinction can be drawn between a case where the husband-owner is present and the wife is driving and one where that situation is reversed.

Let judgment be entered dismissing the plaintiff's complaint with prejudice in its entirety and at the plaintiff's cost.