**UNITED STATES of America,
Plaintiff,**

**v.**

**Vance M. THOMPSON et al., Defendants.
No. LR–66–C–60.**

United States District Court
E. D. Arkansas, W. D.
April 12, 1967.

See also D.C., 272 F.Supp. 774.

J. Winston Bryant, Asst. U. S. Atty., Eastern Dist. of Arkansas, Little Rock, Ark., for plaintiff.

Wayne Owen, Little Rock, Ark., for defendants.

## MEMORANDUM OPINION

HENLEY, Chief Judge.

This is a suit brought by the Government against Vance M. Thompson and others to foreclose a deed of trust on the Summit House Apartments in the City of Little Rock, Arkansas, and for a money judgment against Mr. Thompson and other members of a family partnership, entitled The Summit House Apartments, for alleged misappropriation of rents. The defendants do not resist the foreclosure proper but they deny that they are personally indebted to the Government in any sum. In addition, they have filed a counterclaim against the Government under the provisions of the Tort Claims Act, 28 U. S.C.A. § 2671 et seq.

The cause is now before the Court on the motion of the Government to dismiss the counterclaim as being within the "misrepresentation" or "deceit" exception appearing in 28 U.S.C.A. § 2680 (h). The motion has been submitted on the pleadings and the motion papers, including statements of reasons and authorities in support of and in opposition to the motion as provided by Local Rule 8 of this Court.

The Summit House Apartments were constructed in 1962 by Paul Kapelow and Lester Gross with funds advanced by John Hancock Mutual Life Insurance Co. with the loan being insured by the Federal Housing Administration. The loan from John Hancock was in the sum of $3,100,800 and was secured by a deed of trust on the properties; the contract provided that the apartments should stand as sole security for the loan; there was no personal liability on the part of Gross and Kapelow.

While the project was under construction the interest of Gross and Kapelow was acquired by the defendant partnership consisting of Vance M. Thompson, Elizabeth T. Russell, H. Ripley Thompson, John G. Thompson, Ruth T. Trammell, Vance M. Thompson, Jr. and William H. Thompson.

There seems to be little doubt that the apartments were defectively built; many of them could not be rented, and the partnership defaulted in the payments on the loan with the Government being required to honor its contract of insurance. The defective construction of the apartments is now the subject of litigation in two lawsuits pending on the docket of Judge Gordon E. Young of this District which litigation involves the Government, the Thompsons, the contractors, and the surety on the contractors' bond.

The complaint in the instant case was filed on August 4, 1966, and originally the Government sought only foreclosure of the deed of trust and sale of the properties. A receiver was appointed on the

application of the Government; he is now operating the properties.

As stated, the Thompsons did not resist the foreclosure proper, but before a decree could be rendered and the properties sold the Government filed an amendment to its complaint in which it alleged that the defendants had improperly retained to their own use about $46,000 of income from the apartments, and that they were liable for that sum.

The defendants resist that claim vigorously, and its assertion by the Government prompted the defendants to file the counterclaim which the Government now seeks to have dismissed.

That pleading, which is somewhat hortatory in style, charges in substance that the entire Summit House operation from conception to doom was tainted with fraud and deceit to which the Federal Housing Administration, acting through its officers, agents, and employees, was a party. It is claimed that the project was never intended to be a legitimate enterprise for operational profit but was intended solely to be fraudulently "foisted off upon this innocent Partnership," and that the "acts, conspiracies and fraud of the F.H.A. resulted solely in its fellow conspirators, Paul Kapelow and Lester Gross, being able to foist off upon the Partnership this unworkable, unfit and faulty-constructed Project to the detriment of said Partnership to the extent of $494,530.40 for which it should have judgment over and against the United States of America."

Coming down to specifics, the counterclaim alleges that the Summit House operation was conceived by one Herbert Storthz or a corporation controlled by him; that it was never the intention of Storthz to complete or operate the project; that his sole purpose was to acquire the land on which the apartments were to be built, procure an inflated appraisal of the land, obtain an insuring commitment from the F.H.A., and then sell the project to someone else; it is further alleged that Storthz employed "a newly retired employee of the Federal Housing Administration, who was a brother-in-law to the Chief Counsel for such agency, and for a fabulous fee the said brother-in-law procured the approval of the said commitment to insure the said loan, after which the entire project was sold to (Kapelow and Gross), and they, contrary to the rules and regulations of the F.H.A. were permitted to be not only the sponsors of the Summit House Project, but were permitted to be their own contractors in the construction of the structure located thereon."

It is charged further that the F.H.A. actively conspired with Storthz, Kapelow and Gross to defraud some innocent third party who might be induced to buy the properties ultimately, and that the victim turned out to be the Thompson partnership. It is said that the conspiracy consisted of the making, passing and approving of an income and expense projection for the project which was false and known to be false by the alleged conspirators, in securing a gross over valuation of the real estate on which the apartments were to be built, in permitting negligent and improper construction of the project, and in changing the plans and specifications to the end that the project was built in a cheaper manner and with inferior materials and workmanship so that the building was, now is, and always will be substantially unfit for human occupancy.

In Paragraph III of the counterclaim defendants allege specifically that the partnership paid to the F.H.A. "an enormous fee" to inspect the project during the course of construction and to require that the construction be in accordance with sound plans and specifications; and that the F.H.A. "wholly failed and neglected to make such inspections and wholly failed to see that the building was constructed in accordance with such plans and specifications."

In passing upon the Government's motion to dismiss the Court must assume that the factual allegations of the counterclaim, however far-fetched

some of them may appear to be, are true, and to view the case for motion purposes in the light most favorable to the defendants. Further it is well established that a complaint or counterclaim should not be dismissed for failure to state a claim upon which relief can be granted unless it appears to a certainty that the pleader would be entitled to no relief under any state of facts which could be proved in support of the claim. 1A Barron & Holtzoff, Federal Practice & Procedure, § 356, pp. 360–366; Conley v. Gibson, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80; Kash Industries, Inc. v. Petersen Mfg. Co., 8 Cir., 332 F.2d 1002; Thomason v. Hospital T. V. Rentals, Inc., 8 Cir., 272 F.2d 263; Lada v. Wilkie, 8 Cir., 250 F.2d 211. Nor should a claim be dismissed simply because the claimant may have proceeded under an erroneous theory. Seeley v. Brotherhood of Painters, Decorators & Paper Hangers of America, 5 Cir., 308 F.2d 52, 58.

When it adopted the Tort Claims Act, Congress in general placed the Government on an equal footing with private parties and corporations as far as tort liability is concerned, but Congress did not waive the Government's sovereign immunity in certain specific areas. 28 U.S.C.A. § 2680 provides in part that the Act does not apply to: "(h) Any claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, *misrepresentation, deceit,* or interference with contract rights." (Emphasis supplied.)

█ In view of the statutory language just quoted it requires neither discussion nor citations of authority to establish that defendants cannot recover on their counterclaim on the theory that F.H.A. personnel defrauded the Thompson partnership or conspired to do so. Thus, the allegations of conspiracy, fraud and deceit go out of the case at once.

Counsel for defendants appears to recognize that his clients cannot recover from the Government on a theory of fraud and conspiracy. He earnestly contends in his brief, however, that in view of the fact that defendants paid a fee to the F.H.A. for the latter's services in inspecting the construction of the project and in insuring that the apartment house was built properly and in accordance with sound plans and specifications, a special duty was imposed on the F.H.A., which duty the agency wilfully or negligently failed to perform or to perform properly. Further discussion will be limited to that contention.

In the leading case of United States v. Neustadt, 366 U.S. 696, 81 S.Ct. 1294, 6 L.Ed.2d 614, the plaintiff, Neustadt, was contemplating purchasing a residence in Alexandria, Virginia; the purchase was to be financed by an F.H.A. insured loan. In connection with the acquisition Neustadt was supplied with a copy of a F.H.A. appraisal showing the value of the property to be $24,000; there was nothing in the report indicating that the dwelling was defective in any way. In point of fact the residence was constructed upon unstable ground the shifting of which would in a short time cause the dwelling to sag and the walls to crack; that condition would have been discovered by a reasonably careful inspection of the premises in connection with an appraisal thereof. In reliance on the appraisal report Neustadt purchased the property and moved in. When the ground shifted, as it soon did, and the walls sagged and cracked, Neustadt sued the Government under the Tort Claims Act alleging a negligent misrepresentation as to the condition of the premises on the part of the Government. It was the theory of the plaintiff that the F.H.A. knew that prospective buyers of residential property through F.H.A. financing would rely on F.H.A. appraisals, and that the agency, therefore, owed to such purchasers a duty of making a careful inspection to the end that the purchasers would not suffer loss due to defects in the premises which such an inspection would have revealed.

The District Court allowed recovery, and the Court of Appeals for the Fourth

Circuit affirmed, United States v. Neustadt, 4 Cir., 281 F.2d 596. The Supreme Court granted certiorari because of the fact that the decision of the Court of Appeals conflicted with the decisions of other Circuits in comparable cases.

The Supreme Court reversed. It held that 28 U.S.C.A. § 2680(h) applies to negligent misrepresentations as well as to wilfull frauds and deceits on the part of Government personnel, and it held specifically that a person who buys property in reliance on a F.H.A. appraisal cannot hold the Government liable in tort for damages resulting from negligence on the part of F.H.A. appraisers in making the inspections on which their appraisal was based.

As to the "specific duty" owed by the F.H.A. to purchasers of housing, the Court had this to say (pp. 708–711 of 366 U.S., p. 1301 of 81 S.Ct.):

"Regarding the Court of Appeals' assertion that the Government owed respondents a 'specific duty' to make and communicate an accurate appraisal of the property, by virtue of the provisions of the National Housing Act, we have carefully examined the rather extensive legislative history of that statute, giving particular attention to § 266 thereof, and have found nothing from which we may reasonably infer that Congress intended, in a case such as this, to limit or suspend the application of the 'misrepresentation' exception of the Tort Claims Act. Long before § 226 was added to the National Housing Act, in 1954, requiring sellers to inform prospective buyers of FHA-appraised value, it had been recognized in Congress that FHA appraisals would be a matter of public record, and would thus inure, incidentally, to the benefit of prospective home purchasers, by affording them the 'benefit of knowing the appraised value set upon the property * * * by a trained valuator acting in accordance with a procedure designed to reduce to a minimum, errors that might result from casual or hasty conclusions.' But at the same time, it was repeatedly emphasized that the primary and predominant objective of the appraisal system was the 'protection of the Government and its insurance funds'; that the mortgage insurance program was not designed to insure anything other than the repayment of loans made by lender-mortgagees; and that 'there is no legal relationship between the FHA and the individual mortgagor.' Never once was it even intimated that, by an FHA appraisal, the Government would, in any sense, represent or guarantee to the purchaser that he was receiving a certain value for his money.

"Nor is there any indication that Congress intended, by its 1954 addition to § 226, to modify the legislation's fundamental design from a system of mortgage repayment insurance to one of guaranty or warranty to the purchaser of value received. On its face, § 226 goes no further than to require that a seller of property approved for FHA mortgage insurance shall furnish to the buyer, prior to sale, a written statement disclosing the FHA-appraised value. That Congress did not thereby intend to convert the FHA appraisal into a warranty of value, or otherwise to extend to the purchaser any actionable right of redress against the Government in the event of a faulty appraisal, was made irrefutably clear in the Committee Hearings in both Houses of Congress, the pertinent excerpts from which are set forth in the margin. Moreover, it is not unreasonable to suppose that, at the time § 226 was adopted, Congress was aware of the 'misrepresentation' exception in the Tort Claims Act, and that it had been construed by the courts to include 'negligent misrepresentation.'

"The compulsory disclosure provision of § 226 is but one of numerous instances in which Congress has relegated to a governmental agency the

duty either to disclose directly, or to require private persons to disclose, information for the assistance and guidance of other persons in the conduct of their economic and commercial affairs. In practically all such instances, it may be said that the Government owes a 'specific duty' to obtain and communicate information carefully, lest the intended recipient be misled to his financial harm. While we do not condone carelessness by government employees in gathering and promulgating such information, neither can we justifiably ignore the plain words Congress has used in limiting the scope of the Government's tort liability.

"It follows that respondents' claim is one 'arising out of * * * misrepresentation,' within the meaning of § 2680(h), and hence is not actionable against the Government under the Tort Claims Act. Accordingly, the judgment below must be reversed."

To the extent to which defendants in this case may have relied on F.H.A. appraisals or income and expense projections in deciding to buy the Summit House from Kapelow and Gross, *Neustadt* is, of course, applicable and dispositive. But, that decision in itself does not reach the specific contention of defendants that for compensation the F.H.A. agreed to inspect the premises and to require proper construction under sound plans and specifications, and that it negligently or intentionally breached that agreement.

■ At this point of the discussion the question arises immediately as to whether defendants' ultimate contention is to be characterized as a tort claim or as a claim sounding in contract. Whether such characterization is important in this particular case or not, it could certainly be important in some situations. This is true because a claim against the Government based upon an express or implied contract might be prosecuted successfully either in this Court, 28 U.S.C.A. § 1346, or in the Court of Claims,

28 U.S.C.A. § 1491, even though recovery could not be had thereon under the Tort Claims Act. Under the provisions of section 1346 a contract claim not in excess of $10,000 can be prosecuted either in the district courts or in the Court of Claims, and under the provisions of section 1491 a contract claim can be prosecuted in the Court of Claims regardless of the amount of the claim. If the Government makes a valid contract and breaches it, then it would seem that the breach is actionable regardless of whether the breach was negligent, or whether it was intentional, or whether it was fraudulent or mala fide.

■ As the quoted language of *Neustadt* indicates, the function of the F.H.A. is to insure loans made by private lenders, and the function of the field personnel of F.H.A. is primarily to protect the interests of the Government. Certainly, the F.H.A. does not owe any general duty to purchasers or prospective purchasers of apartment facilities in the process of construction to inspect or supervise the construction or to require the contractors to build soundly or well. And, unless the F.H.A. owed defendants a special duty to inspect and supervise the construction, defendants have no basis for complaint that the construction was not inspected or supervised or was improperly inspected or supervised.

■ Defendants insist that such a special duty existed because they paid F.H.A. an "enormous fee" to inspect and supervise, and that the agency was required to do so and to do so properly. To put it another way, they contend that they made a contract with the F.H.A. and that the agency breached it.

For present purposes the Court must assume that there was a payment of a fee to F.H.A., that there was an agreement on the part of the agency to inspect and supervise, and that the agreement was breached.

However, even when those assumptions are indulged, it appears to the Court that defendants are confronted with an insuperable obstacle to recovery regard-

less of whether they be considered as suing in tort on the basis of a breach of duty created by contract or whether they be considered as suing for breach of contract, regardless of the quality of the breach.

If the counterclaim is based upon breach of contract, then this Court has no jurisdiction of it in view of the amount involved.

If the counterclaim sounds ultimately in tort with the tort being referable to an underlying contractual duty, it seems clear to the Court that in assuming that duty on behalf of the F.H.A. the personnel of that agency acted completely outside the scope of their authority and employment, and that the Government is not liable on account of their failure to perform an agreement which they had no right to make in the first place.

■■ It is settled that the Government is not bound by the unauthorized acts of its agents. It is also established that all government agents and employees are special agents of limited authority, and that all persons dealing with such agents and employees are charged with notice of that fact and of the limitations upon the authority of the agents with whom they deal. Federal Crop Insurance Corp. v. Merrill, 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10; United States v. Crance, 8 Cir., 341 F.2d 161; Shepard Engineering Co. v. United States, 8 Cir., 289 F.2d 681; Stone v. United States, 8 Cir., 286 F.2d 56; Farm Security Administration v. Herren, 8 Cir., 165 F.2d 554; United States v. Swint, W.D.Ark., 185 F.Supp. 678; United States v. Westmoreland Manganese Corp., E.D.Ark., 134 F.Supp. 898; Watt v. United States, E.D.Ark., 123 F.Supp. 906.

The underlying contract which the defendants postulate in this case was that the F.H.A. for a fee would, in effect, perform for defendants the services of a supervising architect or engineer in connection with the construction of the Summit House. It is evident to the Court that no F.H.A. official, regardless of his niche in the agency hierarchy, had any authority to make any such agreement or to bind the Government with respect thereto.

Let the motion to dismiss the counterclaim be granted.