Vona **HELTON**, Plaintiff,

v.

**UNITED STATES** of America, Defendant and Third-Party Plaintiff,

v.

**J. T. ARNOLD, III**, in personam, and a certain unnamed ferry-barge, her tackle, equipment, etc., in rem, Third-Party Defendants.

**Civ. A. No. H 67 C–18.**

United States District Court, E. D. Arkansas, E. D.

April 2, 1969.

James R. Van Dover, Daggett & Daggett, Marianna, Ark., for plaintiff.

Hall Baetz, Admiralty & Shipping Section, Dept. of Justice, Washington, D. C., and Robert F. Fussell, Asst. U. S. Atty., Little Rock, Ark., for defendant and third-party plaintiff.

Mike J. Etoch, Jr., Helena, Ark., for third-party defendants.

## MEMORANDUM OPINION

OREN HARRIS, Chief Judge.

This action by the plaintiff, Vona Heltion, is a claim against the United States of America seeking damages for personal injuries allegedly caused by the negligence of an employee of the United States of America. The United States denied liability to the plaintiff and pursuant to the approval of the court filed a third-party complaint against J. T. Arnold, III, *in personam,* and a certain unnamed vessel, *in rem,* alleging that third-party defendants were liable to the plaintiff, or in the alternative to indemnify the government in the event the United States of America is determined to be liable to the plaintiff.

## FINDINGS OF FACT

On September 8, 1964, J. T. Arnold, III, contracted to supply gravel to the

United States. Under the contract, Arnold was obligated to deliver gravel to specified points on a levee in Eastern Arkansas, on the east side of the St. Francis River. The methods of transport were at the sole discretion of the contractor. Arnold chose to obtain the gravel from a pit on the west side of the river, near Phillips Bayou, Arkansas. To transport it across the river he purchased a barge and brought it to the Phillips Bayou ferry crossing. Arnold made an agreement with Lee County that he would transport passengers across the river in exchange for the right to substitute his ferry-barge for the regular county barge which was on the line. The small county barge was removed and Arnold's was substituted. Arnold employed regular crewmen to operate his barge.

Vona Helton was a farmer and a part-time employee of Arnold. During the winter, when because of the weather Arnold was not hauling, Helton was regularly employed to watch Arnold's barge, keeping it properly moored, pushed off, etc. On July 8, 1965, the day he was injured, Helton wanted to cross the river to his farmland on the other side.

Donald Tyner was a United States Corps of Engineers gravel inspector. His job, as provided in his job description sheet, was to check gravel quality and ensure that it was properly delivered to the levee. Tyner's inspection duties did not include manual labor at or around the job site. His duties were limited to inspection. Tyner was stationed near the job site. When Arnold was hauling, Tyner would check the gravel on the west side of the river and then he would ride across on Arnold's ferry to the east side to see that the gravel had been delivered. When Arnold was not hauling, Tyner was to report to his superiors in Memphis for other work. Tyner was not employed to assist Arnold in any way. Tyner had never worked in any capacity on Arnold's ferry prior to July 8, 1965.

Arnold hauled gravel on November 11, 12, 13, 14 and 16, 1964, and thereafter shut down for the winter. On July 6, 1965, Arnold began hauling again. But on July 7 and 8, 1965, problems with the gravel pit caused him to stop work.

On July 8, 1965, Tyner came to the job site. As Arnold was not hauling, Tyner desired to return to Memphis. Although he could have taken the longer route to Memphis, Tyner told Arnold that he would like to be put across on the barge so he could take the shorter route. Arnold replied that he would be glad to transport Tyner across, and that Helton also wanted to cross. Arnold and Helton walked, and Tyner drove down to the ferry. There were no regular crewmen on duty.

The ferry had ramps at either end. The ramps were counter-balanced, connected by free running cables extending through pulleys on frameworks at either end of the barge. Each apron was supported by the weight of the other by means of the taut connecting cables. Another cable ran through pulleys and passed around a reduction winch drum. The connections of the support cables and winch cable were arranged so that when the winch was turned one apron was raised and the opposite one was lowered. However, if one apron rested on the riverbank and the other apron was raised, there would be no counterbalancing effect. In such event, the entire energy necessary to raise the riverward apron would have to come from the winch. Turning the winch in the wrong direction would lead to increasing tension on cable to the riverward apron, as the shoreward apron could not move down. Thus, the weight load of the riverward apron would be transferred from the support cable to the winch cable.

When they arrived at the ferry, Arnold told Helton to get a hold on the winch and crank the shoreward apron up off the bank. Tyner, meanwhile, drove his truck aboard. Helton walked over to the winch and began turning it. Tyner

drove across the ferry to raise the shoreward side off the bank, and got out of his truck. Arnold said to Tyner "you had better help that fellow over there, he is pretty old to raise and lower the aprons." Helton had by this time turned the crank several times.

Tyner walked over and faced Helton. Tyner stood with his back to the riverbank, facing away from the apron being raised. Helton stood facing the other direction, looking toward the bank and the apron he was trying to raise. The crank handle was passed from one to the other on each revolution. Helton, who was facing shoreward, failed to notice that the shore apron was not coming up. He kept on cranking.

On each revolution Tyner would pass the crank handle over to Helton, who would in turn pass it back. In the process Helton picked up a short piece of steel to use to lock the cogs. Thereafter he turned the crank with one hand.

The crank became harder to turn. Tyner realized that insufficient progress was being made, and stated that there must be something wrong. Arnold said that if the crank was hard to turn, it was being turned the wrong way. Tyner told Helton he was going to have a cigarette. Helton at this time was holding the crank with one hand, without apparent difficulty. Tyner turned and walked about ten feet away. Several seconds passed. Helton made no protest and gave no indication of difficulty. Then, without warning or a request for assistance, Helton began to turn again with one hand. He moved the crank one and a half or two revolutions. He was apparently trying to line up the cogs so that he could lock the crank with the metal bar. The crank suddenly started turning very fast, and Helton released it and jumped out of the way. The rapidly spinning crank struck him on the arm, injuring him.

Helton had incorrectly begun turning the winch the wrong way. He testified that he believed that simply because the

winch had a crank it would have to turn to the right. He believed that to turn the winch to the left would be backwards. He requested no instructions, and did not check to see that the apron was being raised. When Tyner walked away, Helton did not complain, nor did he request assistance when he began to turn again.

From these facts developed during the trial of the case, ore tenus testimony, exhibits and stipulations it is the opinion of the court that the United States of America should not be held liable to the plaintiff, Vona Helton, for any damages as a result of personal injuries that may have been sustained in connection with this incident.

## CONCLUSIONS OF LAW

■ Admiralty jurisdiction in a tort case is dependent upon the character of the waters upon which the occurrence takes place. The admiralty jurisdiction extends to suits for personal injuries to a crewman, The Osceola, 189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760 (1903), a land worker doing a crewman's job, Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946), or a passenger, The Admiral Peoples, 295 U.S. 649, 55 S.Ct. 885, 79 L.Ed. 1633 (1935), occurring while aboard a vessel on navigable waters.

The question of whether a river was navigable for purposes of the admiralty jurisdiction was carefully analyzed in In re River Queen, 275 F.Supp. 403 (W.D. Ark.1967), aff'd sub nom. George v. Beavark, Inc., 402 F.2d 977 (8 Cir., 1968). In affirming the district court, the circuit court stated that the test is whether a water course is susceptible of use for purposes of commerce and capable of practical general uses. The court of appeals mentioned the trend toward liberality in the treatment of admiralty jurisdiction.

■ It was stipulated by the parties prior to trial that the St. Francis River is navigable in fact at the place where

this accident occurred. The ferry-crossing is located at a point less than four miles from the confluence of the St. Francis River with the Mississippi. The ferry-barge involved in the accident, approximately 80 feet by 20 feet, was towed upriver via the Mississippi from Helena for use in the graveling operation. The river was quite wide at Phillips Bayou, and no obstructions blocked navigation between there and the Mississippi. As the St. Francis at that point was navigable and susceptible of being used as a highway for commerce, this case is within the admiralty jurisdiction of this court. 46 U.S.C.A. § 740, 28 U.S.C.A. § 1333.

To establish governmental liability in this case, plaintiff must show (1) that Tyner, at the time of the accident, was acting within the scope of his employment as a servant of the Government, and (2) that Tyner was negligent.

In deciding whether the driver of a Government vehicle was acting within the scope of his employment, this court said, in Watt v. United States, 123 F.Supp. 906, 913–914 (E.D.Ark., 1954):

In taking up this problem, it must be kept in mind that the Government's tort liability is strictly limited by the terms of the Tort Claims Act and cannot be extended beyond those terms; further, the Government acts only through agents whose powers are defined by statute or regulation and can be bound by the acts of its agents only in cases where the latter are acting within the scope of the authority actually conferred upon them; such authority cannot be extended by custom, usage or estoppel; nor is the mere fact that the Government may derive some benefit from the act performed sufficient to impose liability upon it with respect to a tort committed in the performance of such act. The principles just stated were well expressed by Judge Goodman in his opinion in Cannon v. United States, D.C.Cal., 84 F.Supp. 820, wherein it was said:

"In waiving its sovereign immunity and consenting to be sued, the United States fixed and bounded the area of its liability. And its liability as so fixed, cannot, under any equitable or quasi-equitable theory, be extended beyond the stated limits. By this statute, the United States consents to be sued (1) in cases of negligence of employees 'while acting within the scope of his office or employment' and then only (2) if besides, the circumstances are such that a private person would be liable under the law of the place where the act or omission of the employee occurred. * * *

"There is no question but that the Government of the United States acts only through its agents with power delegated and defined by statute or regulation, which all who deal with such persons are presumed to know. The United States can be bound only by agents acting within the scope of the authority delegated to them. * * *

"Some point is also made that the services extended to plaintiff were in a sense for the benefit of the government * * *. However there is no known doctrine by which responsibility or liability is imposed upon the United States because of any benefit to it, nor does responsibility ensue as a result of estoppel, or like equitable theory.

"Since the officers and employees of the United States here clearly and admittedly acted beyond the scope of their authority, there can be no liability under the Federal Tort Claims Act. * * * *" 84 F. Supp. at pages 821–823.[5] [Footnote omitted.]

The duties of Sgt. Reedy as unit administrative assistant were prescribed by National Guard Bureau Circular No. 4,[6] [Footnote omitted.] issued January 23, 1950; they were almost entirely clerical and were to be per-

formed in and around the armory at Jonesboro.

Said duties did not include the transportation of property to and from Little Rock. * * *

In this case, Tyner's duties were also prescribed by a job description sheet, which was introduced into evidence. It is clear that Tyner's inspection duties did not include winch operation. Tyner's duties were limited, as shown by the Job Description, Contract, and his testimony, to *inspection*. Thus, under the *Watt* case the United States cannot be held liable for Tyner's acts with respect to the operation of Arnold's barge.

Tyner was not acting within the scope of authority actually conferred upon him, and could not impose liability upon the United States.

The "borrowed servant" doctrine is an old and established doctrine in admiralty. See Standard Oil Co. v. Anderson, 212 U.S. 215, 29 S.Ct. 252, 53 L.Ed. 480 (1909); Park S. S. Co. v. Cities Service Oil Co., 188 F.2d 804 (2d Cir.1951), and cases cited therein. The doctrine is equally well established in Arkansas. Barton-Mansfield Co. v. Bogey, 201 Ark. 860, 147 S.W.2d 977 (1941); Arkansas Natural Gas Co. v. Miller, 105 Ark. 477, 152 S.W. 147 (1912).

■ Briefly stated, the borrowed servant doctrine dictates that when a servant in the general employ of one person comes under the control of another for the performance of a particular service for the latter, the servant, in respect of his acts in that service, is to be dealt with as the servant of the latter and not of the former. This is in accord with the general common law of vicarious liability: one who is in a position to exercise control over the situation giving rise to injury should bear the loss.

In a leading case, Denton v. Yazoo & Mississippi Valley R. R. Co., 284 U.S. 305, 52 S.Ct. 141, 76 L.Ed. 310 (1932), the borrowed servant doctrine was applied to facts analogous to the case at bar. A railroad porter, in the general service of two railroad companies (the defendants) was loading mail into a mail car under the direction of a United States postal transfer clerk. The porter was not, as to that work, under the direction or control of the defendants. The petitioner sustained an injury due to the alleged negligence of the porter. The Court, 284 U.S. at 308, 52 S.Ct. at 142, quoted from Standard Oil Co. v. Anderson, 212 U.S. 215, 220, 29 S.Ct. 252, 53 L.Ed. 480 (1909):

> The servant himself is, of course, liable for the consequences of his own carelessness. But when, as is so frequently the case, an attempt is made to impose upon the master the liability for those consequences, it sometimes becomes necessary to inquire who was the master at the very time of the negligent act or omission. One may be in the general service of another, and, nevertheless, with respect to particular work, may be transferred, with his own consent or acquiescence, to the service of a third person, so· that he becomes the servant of that person with all the legal consequences of the new relation.

> *      *      *      *      *      *

The Court looked to several factors in determining the nature of the tortfeasor's relationship to defendants. Such factors as power of substitution or discharge, payment of wages, whose work was being done, and the intent of the parties were considered. But the basic objective was to determine "whose is the work and whose is the power of control." After reviewing these factors, the Court held that the porter was not a servant of the railroads at the time he was loading the mail car.

■ Here, as in *Yazoo*, a servant, Tyner, in the general employ of one master, the United States, came under the direction and control of another, Arnold. Only the temporary employer, Arnold, had the power to substitute one crewman for another. Only the temporary employer had the power to discharge a

crewmember. The work being done was Arnold's. Only Arnold had the right to control and power to control the way work was to be done on the ferry-barge. The United States was powerless to control or direct such activities. Without that power of control the United States could not be responsible for the servant's acts.

Tyner was a borrowed servant of Arnold, and could not, at the time of the accident, visit liability upon the United States.

Running a winch on a ferry-boat was remote from Tyner's job as a gravel inspector.[1] Tyner was not a specialist in the operation of winches. The Government in no way directed the operation, but Arnold did. Power to control and direct the conduct of the winching operation Tyner undertook was unquestionably vested in Arnold,[2] and therefore the United States cannot be liable for Tyner's acts.

It is for the above reasons that this case falls squarely within the language of The General De Sonis, 179 F. 123, 126 (W.D.Wash.1910):

It is the opinion of the court that * * * the relation of master and servant is suspended when a representative of one employer volunteers to assist the servants of a different master in the performance of manual labor.

■ Even if at the time of the accident, Tyner had been acting as a servant of the Government, the facts established at trial proved that Tyner acted reasonably in the circumstances, and did not proximately cause the plaintiff's injuries.

Tyner was not a winchman and had never operated the ferry before. He had no reason to know that Helton was operating the winch improperly. Tyner acted reasonably in helping Helton turn the winch in the manner Helton had chosen.

It was not unreasonable for Tyner to walk away from the winch while Helton had control. It did not appear that Helton was having any difficulty holding the crank with one hand. And there was no indication that Helton needed help: no request, complaint or sign was made by the plaintiff.

■ It was the plaintiff's own conduct which caused his injury. Several seconds after Tyner walked away, and without warning, Helton began again to turn the winch. Tyner had no part in this conduct, and in no way caused the subsequent events. When Helton was turning the crank *with one hand* he lost control, and it spun and injured him. The negligence was solely that of the plaintiff.

As plaintiff's own conduct caused his injury, and no negligence other than that of the plaintiff has been established, third-party defendants are not liable to plaintiff Helton or third-party plaintiff the United States of America.

An order will be entered accordingly.

---

1. The simple fact that Tyner was driving a Government vehicle is, of course, insufficient by itself to impute liability to the vehicle's owner. Richardson v. St. Charles St. John the Baptist Bridge & Ferry Authority, 284 F.Supp. 709 (E.D. La.1968). Oliphant v. Town of Lake Providence, 193 La. 675, 192 So. 95 (1939).

2. Were it argued that no control was actually exercised by Arnold, the result would be the same. The criterion is not who in fact exercised control, but who had a right to exercise it. Dunmire v. Fitzgerald, 349 Pa. 511, 37 A.2d 596 (1944).